**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**JACK GORDON GREENE**                                             **PETITIONER**

**V.**                              **CASE NO.  5:04CV00373**

**DEXTER PAYNE, Director,**
**Arkansas Division of Correction**                          **RESPONDENT**

### RESPONSE TO MOTION FOR RELIEF FROM JUDGMENT

Comes now the respondent, Dexter Payne, Director, Arkansas Division of

Correction, by and through counsel, Leslie Rutledge, Attorney General, and Karen

Virginia Wallace, Assistant Attorney General, and for his response, states:

I.    History and Current Request for Relief

• **History**

Petitioner Jack Gordon Greene is an Arkansas prisoner who is under a

sentence of death first imposed in 1992 for the brutal murder of Sidney Jethro

Burnett.  The underlying facts of the case are set forth in the direct-appeal opinion,

in which his case was remanded for resentencing.  *Greene v. State*, 317 Ark. 350,

355-356, 878 S.W.2d 384, 388 (1994).  He was resentenced to death in 1996 and,

after reversal, again in 1999, a sentence affirmed by the Arkansas Supreme Court.

*Greene v. State*, 335 Ark. 1, 977 S.W.2d 192 (1998); *Greene v. State*, 343 Ark.

526, 541, 37 S.W.3d 579, 590 (2001)(Supplemental Opinion), *cert. denied Greene*

*v. Arkansas*, 534 U.S. 858, 122 S.Ct. 135 (2001)  That court also affirmed the denial of his Rule 37 postconviction petition in *Greene v. State*, 356 Ark. 59, 146 S.W.3d 871 (2004).

No expert who examined Greene during the pendency of his legal proceedings through the denial of certiorari in this federal habeas case found him to be intellectually disabled.  During his state court proceedings, Greene was evaluated by Arkansas State Hospital professionals on four occasions.  Before his 1992 trial, he was examined by Dr. O. Wendall Hall, III, M.D., a forensic psychiatrist, Michael J. Simon, a forensic psychologist, and Marla Gergely, L.C.S.W.  ECF No. 9A1, 1st Tr. R. at 47-50.  The forensic report discussed a 1985 psychiatric treatment report made during a hospitalization in North Carolina, which led to a diagnosis of mixed substance abuse, adjustment disorder with mixed disturbance of emotions and conduct, and a mixed personality disorder.  *Id.* at 48. Greene acknowledged a long history of alcohol and drug abuse as well as a long history of legal difficulties, and he reported that he had spent the majority of his adult life in prison.  *Id.*  During the interview, he was verbal, cooperative, and "clearly well oriented and in good contact with reality."  *Id.*  His thought processes and content were normal, and he was relatively articulate.  *Id.*  He did not behave unusually or bizarrely, and he had a very good understanding of the legal system. *Id.*  He was diagnosed with alcohol abuse, cocaine abuse, and personality disorder

2

not otherwise specified, and doctors noted that he "appeared to be of at least average intelligence." *Id.*

Before his 1996 resentencing, he was evaluated by a team consisting of O. Wendell Hall, III, M.D., a forensic psychiatrist, Michael J. Simon, Ph.D., and Shirleen Cox-Crumpton, L.C.S.W.  Their report is found at ECF No. 9F2, 2d Tr. R. at 236-237.  They reported that his prison file revealed no receipt of, or any request for, mental health services since his arrival at the Maximum Security Unit.  They met with him for about 1 ½ hours.  He was cooperative, very verbal, clearly oriented, and appeared to be in good contact with reality.  He discussed his legal situation in both North Carolina and Arkansas in great detail.  He displayed a good understanding of the legal system and felt that he was likely to receive the death penalty again.  "While he seemed intent on pursuing various appeals, he also claimed that he had 'accepted his sentence' and understood that he may one day be executed."  He discussed problems he had with staff and inmates and expressed a belief that his life was in immediate danger if he remained at the prison.  The team felt that his beliefs did not appear to be due to any type of mental disease or defect. "The matter-of-fact manner in which he discussed this material suggested that it may be primarily a manipulative attempt to get attention."  He was diagnosed with a personality disorder, not otherwise specified, with antisocial and narcissistic traits.

3

He refused to cooperate with an evaluation by Dr. Charles H. Mallory, Ph.D,
a psychologist, before the 1999 resentencing, but based on prior forensic
examinations and a review of Department of Correction and State Hospital records,
he was diagnosed with antisocial personality disorder.  ECF No. 9F15, 3d Tr. R. at
53-56.  The examiner concluded, based on a review of his written requests for
medical care, that he did not suffer from any communication impairment or from
intellectual disability, and he estimated Greene's intellectual abilities as in the
average range.  *Id.*

When Drs. Hall and Mallory evaluated Greene after the 1999 resentencing to
determine his competency to waive an appeal, they found that he "showed an alert,
friendly and appropriate manner," he "made eye contact, smiled, and expressed his
thoughts clearly," and his demeanor was "relaxed and casual."  ECF No. 9F15, 3d
Tr. R. at 112-113.  "He showed no impairment of orientation, consciousness,
attention, concentration, or memory during approximately 45 minutes of
examination[,]" and "[h]e did not show any signs of mental disease or defect[.]"
*Id.*  He told the physicians that since 1993 he had been sentenced to death in three
separate trials and that "it's time to go.  It's time for closure:  for me, for the
Burnett (victim's) family and for my family."  *Id.*  When asked about his
understanding of his choice to receive the death penalty and to waive his appeal
rights, he stated that he is religious and expressed his belief that he would find

4

"peace" when he is executed. *Id.* Greene was found competent to waive appeal, and that determination was affirmed on appeal in *State v. Green*, 338 Ark. 806, 1 S.W.2d 442 (1999), though the Arkansas Supreme Court reviewed the trial record pursuant to its duty to automatically review the record in all death penalty cases and found no reversible error. *See Greene v. State*, 343 Ark. 526, 6542, 37 S.W.3d 579, 590 (2001).

On October 20, 2004, Greene filed a federal habeas action, through counsel, asserting numerous grounds for relief, including the claim that he is mentally retarded and therefore ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002), and a claim of ineffective assistance of trial counsel in the penalty phase of trial due to counsel's failure to present mental-health mitigation evidence and failure to test for brain damage. ECF No. 1. On August 26, 2009, the court received a letter from Greene complaining about his attorneys and stating his disapproval of further testing. At a hearing on February 24, 2010, Greene personally advised the court, over habeas counsel's objections, that it was not his desire to pursue the claim of mental retardation and that he wished to withdraw or waive this claim. ECF No. 105, at 5. Finding that "the issue of Greene's competency [had] been sufficiently raised," ECF No. 101 at 1, pursuant to *Rees v. Peyton,* 384 U.S. 312, 314 (1966), the court ordered that Greene be subjected to temporary hospitalization to determine, among other things, whether Greene was

suffering from a mental disease, disorder or defect that rendered him incapable of understanding the habeas proceedings and communicating with his counsel, whether he understood that he is to be executed and the reason for his execution, and to determine Greene's intelligence quotient and render an opinion as to whether Greene is mentally retarded under Arkansas law.  ECF No. 101 at 2.

Pursuant to the district court's order, Greene was assessed over a two-month period by Dr. Christina A. Pietz, a psychologist at the United States Medical Center for Prisoners in Springfield, Missouri.  Dr. Pietz issued a forensic report stating her conclusion that Greene was competent to make a rational decision as to whether he would abandon his *Atkins* claim.  Hr'g Resp't Ex. 2, Forensic Report.

On October 6-7, 2011, the Court conducted an evidentiary hearing to determine whether Greene was competent to waive his *Atkins* claim and whether his waiver was knowing and voluntary.  Habeas counsel presented testimony from Dr. Dale Watson, Ph.D, a neuropsychologist, and Dr. George Woods, M.D., a neuropsychiatrist; both opined that Greene suffers from both a mental defect and a mental disease, making him incompetent to waive his *Atkins* claim.  Their testimony is summarized in the district court's order.  ECF No. 196, Mem. Op. & Order at 7-11.  The order also notes that Greene's former habeas counsel, Assistant Federal Defender Scott Braden, testified that Green is unable to cooperate with

counsel because of his preoccupation with physical complaints and paranoid beliefs.  ECF No. 196, Mem. Op. & Order, 11.

Dr. Peitz testified on Respondent's behalf at the competency hearing.  Her testimony is summarized in the order as well.  ECF No. 196, Mem. Op. & Order, 12-15.  She administered the Wechsler Adult Intelligence Scale-Fourth Addition (WAIS-IV),  though Greene was unwilling to attempt a subtest involving visual puzzles.  That test showed his full scale IQ as 76, and his general ability score as 80.  Dr. Pietz's opinion was that the IQ score of 76 likely underestimated Greene's overall IQ because he was unwilling to attempt the visual puzzle subtest.  His WAIS-IV score for verbal comprehension, which measures verbal reasoning and concept formation indicated he should have no difficulty expressing himself in social situations requiring verbal skills.  Hr'g Resp't Ex. 2 at 17-22.

Greene also spent about two hours completing the Minnesota Multiphasic Personality Inventory-2 (MMPI-2).  Hrg. Tr. at 350.  That involved reading 337 questions and providing answers by filing in dots.   Hrg. Tr. at 354-355.  The results of that test showed elevated scores for somatic complaints and antisocial behavior, but they did not indicate a psychotic disorder, schizophrenia, or a delusional disorder.  Hrg. Tr. at 357-359, 362.  Dr. Pietz wanted to administer additional tests, including a competency interview, but Green refused because he wanted to return to Arkansas.  Hrg. Tr. at 350, 365-366.  Dr. Pietz testified that,

from Greene's perspective, he had cooperated with the tests the Court had ordered and was unwilling to do more.  Hrg. Tr. at 366.  He told her, "I feel confident that the intelligence test you administered demonstrates that I have above-average intelligence, which should prove that I am not mentally retarded as those lawyers in Arkansas profess and, therefore, not incompetent.  That has never been the issue, yet they continue to – they continue to argue it is."  Hrg. Tr. at 367.

Dr. Pietz met with Greene several times after he refused further testing.  On one of those occasions, he was reading the book, *American Caesar*.  He told her it was about General Douglas MacArthur and that it was fascinating.  Hrg. Tr. at 367-368.  She noted that in 1992, 1995, and 1999, evaluators at the Arkansas State Hospital determined that Greene did not suffer from a mental illness.

Dr. Pietz testified that Greene "picks and chooses" his activities, and he independently determines his level of cooperation.  Hrg. Tr. at 378.  She agreed that he did not have a meaningful relationship with his attorneys, but she opined that he had a rational basis for refusing to work with them.  Hrg. Tr. at 378.  He told her:

> Look, this is my life not theirs.  The direction they are going makes no sense.  I am not mentally retarded.  There is no way anyone with sense will go for that.  They have had my case for seven years and [have] done nothing to help me.  They've never shown [me] any documents, motions, nothing.  Why would I choose to work with them[?]

Hr'g Resp't Ex. 2, Pietz Forensic Report, at 24.

Dr. Pietz stated that Greene doesn't want his attorneys arguing mental retardation, that he doesn't want to appear mentally ill, and he doesn't feel that argument is going to work.  She said that he wants his counsel to use different arguments.  Hr'g. Tr. at 379.  She provided a specific example of Greene's capacity to weigh the potential risks and benefits of various courses of action.  In describing his appeal, Greene stated:

> When they convicted me in Arkansas and gave me the death penalty, they used the conviction from North Carolina as a [aggravating] circumstance.[1]  You can't do that.  Once I won my appeal, the state of Arkansas had no leg to stand on.  Don't get me wrong.  I believe in capital punishment and I did kill two men.  That's not what this is about.  I know the law.  I filed the appeal on my own.  I don't need any attorney saying I'm mentally retarded.  That's bogus.  If you want to appeal my case, appeal it based on something that's accurate.  Not this bullshit.

Hr'g Resp't Ex. 2, Pietz Forensic Report, at 25.

Dr. Pietz found nothing delusional about Greene's understanding of his habeas claims.  She acknowledged that his odd physical behaviors were atypical, but she found that he was capable of adequately answering questions and providing details, even when he was physically contorting his body.  *Id.* at p. 26.

---

[1] Though Green said "mitigating" instead of "aggravating," the district court found that he misspoke based on *Greene v. State*, 317 Ark. 350, 878 S.W.2d 384 (1994)(finding death sentence wrongfully predicated on aggravating circumstance evidence of North Carolina conviction that was later reversed by North Carolina Supreme Court).  ECF No. 196, Mem. Op. & Order, 15.

Following the competency hearing, the district court determined that Greene did not suffer from a mental disease, disorder or defect that rendered him incapable of rationally understanding the habeas proceedings.  The court additionally found that "Greene's decision [to waive his *Atkins* claim] is in fact the product of a rational thought process."  ECF No. 196, Mem. Op. & Order, 17.  The district court further determined that Greene's waiver decision was knowing and voluntary."  ECF No. 196, Mem. Op. & Order, 18-19.  In making these determinations, the district court specifically was not persuaded by the testimony and opinions of Drs. Watson and Woods.  ECF No. 196, Mem. Op. & Order, 16.  Applying the standards set forth in *Rees* as interpreted by the court of appeals in *Smith v. Armontrout*, 812 F.2d 1050, 1057 (8th Cir. 1987), the district court found that, even assuming Greene suffers from a mental defect or disease and has delusions about his physical conditions and the motives of his attorneys, he was "cognizant of and appreciate[d] the practical consequences of abandoning his *Atkins* claim" and his "decision is in fact the product of a rational thought process."  ECF No. 196, Mem. Op. & Order, 16-17.  The district court found his waiver to be knowing and voluntary, and it allowed him to withdraw his *Atkins* claim.  ECF No. 196, Mem. Op. & Order, 18-21.  The Court's Opinion and Order of Dismissal was entered March 30, 2015.  ECF No. 224.

10

Greene sought, but was denied, a COA from the district court as to 19 claims, including his *Atkins* claim.  ECF No. 241, Order, 5-7.  In its seven-page order denying the COA, that court referred back to its 103-page order adjudicating the claims and explained at length its reasons for denying a COA.  On April 15, 2016, Greene filed an 80-page sealed motion for a COA with the court of appeals in No. 16-1456 requesting a COA on 17 claims.  Entry ID 4389239.  Respondent filed his response (Entry ID 4436829) on May 24, 2016, and the matter was submitted to the court of appeals on May 25, 2016.  The motion was denied by summary order on June 3, 2016.  Entry ID 4407173.  Greene then filed a petition for panel rehearing and rehearing *en banc* further narrowing the number of claims for which he sought a COA and contending that the court of appeals was required to explain its reasons for denying a COA.  Entry ID 4414029.  After requesting a response on whether "the district court applied the correct legal standard in determining whether [Petitioner] was competent to waive an Atkins claim," Order, No. 16-1456 (8th Cir. July 11, 2016), the court denied rehearing on August 31, 2016, with Judge Kelly voting to grant rehearing *en banc*.  Entry ID 4443386.  Greene then filed a petition for a writ of certiorari with the Supreme Court of the United States, which was denied on May 1, 2017.  *Greene v. Kelley*, 137 S.Ct. 2093 (2017) (Mem).

11

- **Current Request**

Greene now asks the Court to reopen his case and adjudicate his *Atkins* claim under Rule 60(b)(6), contending that he "recently" has been diagnosed as intellectually disabled and that his execution would violate the Eighth Amendment. He argues that there are four extraordinary circumstances that support his request: (1) new scientific evidence concerning intellectual disability has developed since 2012, when the Court allowed Greene to waive the claim; (2) new legal precedent calls into question the Court's reasoning in allowing the waiver; (3) Greene has an updated diagnosis of intellectual disability; and (4) the Eighth Amendment bars his execution as an intellectually disabled person "even if [he] insists that he's not intellectually disabled and wishes to waive the claim."  He contends that his request is not a successive habeas petition barred by 28 U.S.C. §2244(b), alleging that this Court did not reach the merits of his *Atkins* claim because it found him competent to waive it.  ECF No. 257 at 1, 20.  He also contends that his request has been made within a reasonable time.

## II.  Discussion

The relief Greene seeks under Rule 60(b)(6) requires him to demonstrate that extraordinary circumstances justify it.  The burden of demonstrating extraordinary circumstances rests with him.  *See Gonzalez v. Crosby*, 545 U.S.

524, 535 (2005) (stating "a movant seeking relief under Rule 60(b)(6) [must] show 'extraordinary circumstances' justifying the reopening of a final judgment[ ]").

Greene now asks the Court to reopen his case, reconsider his waiver, and adjudicate his *Atkins* claim under Rule 60(b)(6), contending that he recently has been diagnosed as intellectually disabled and that his execution would violate the Eighth Amendment.  Greene contends that there are four extraordinary circumstance supporting his request:  (1) new scientific evidence concerning intellectual disability has developed since 2012, when the Court allowed Greene to waive the claim; (2) new legal precedent, *Moore v. Texas*, ___ U.S. ___, 137 S.Ct. 1039 (2017) ("*Moore I*") and *Moore v. Texas*, ___ U.S. ___, 139 S.Ct. 666 (2019) ("*Moore II*"), calls into question the Court's reasoning in allowing the waiver; (3) Greene has an updated diagnosis of intellectual disability; and (4) the Eighth Amendment bars his execution as an intellectually disabled person "even if [he] insists that he's not intellectually disabled and wishes to waive the claim."

Greene's motion has no merit.  Significantly, Greene does not challenge in his motion the Court's 2012 determination that he is competent to waive an *Atkins* claim.  As explained more fully below, Greene's motion is a prohibited second or successive petition, it is untimely, and it does not demonstrate the extraordinary circumstances that are necessary to reopen a final judgment under Rule 60(b)(6). Consequently, this Court should deny the motion, or, alternatively, transfer the

13

motion to the Court of Appeals for the Eight Circuit as a successive petition request.

A.  Greene's motion constitutes a second or successive petition for which jurisdiction is lacking.

Greene's motion is jurisdictionally unsound because it presents a claim for habeas relief that requires authorization under 28 U.S.C. § 2244(b).  A motion for relief under Rule 60(b) is treated as a second or successive habeas petition if it conflicts with the requirements of the AEDPA.  *See Gonzalez*, 545 U.S. at 531-32.  It conflicts with 28 U.S.C. § 2244(b) if it contains one or more claims.  A motion contains a claim, and thus constitutes a second or successive habeas petition, if it asserts a federal basis for relief from the state court's judgment of conviction by, among other things, "attack[ing] the federal court's previous resolution of a claim *on the merits*[.]"  *Id.* at 532 (emphasis in original).  "A habeas petitioner's filing that seeks vindication of such a claim is, if not in substance a 'habeas corpus application,' at least similar enough that failing to subject it to the same requirements would be 'inconsistent with' the statute."  *Id.* at 531 (citing 28 U.S.C. § 2254 Rule 11).

While a Rule 60(b) motion does not advance a "claim" when it "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings[,]" *Id.* at 532, "[a]n attack based on the movant's own conduct, or his habeas counsel's omission . . . normally

does not go to the integrity of the proceedings, but in effect asks for a second chance to have the merits determined favorably[,]" *Id.* at 532, n. 5.  Here, Greene's waiver of his *Atkins* claim was his own conduct, and his Rule 60(b) motion is just such a request for this Court to ignore his competently entered waiver and provide him with a second chance to have the merits determined in his favor.  Thus, it is a "claim" that requires authorization under 28 U.S.C. § 2244(b).  His request that this Court overturn his valid waiver of his *Atkins* claim—a determination made after a hearing, affirmed by the Eighth Circuit Court of Appeals, and for which the Supreme Court of the United States denied certiorari—and allow him to litigate his *Atkins* claim runs afoul of 28 U.S.C. § 2244(b) and, as a jurisdictional matter, cannot qualify for Rule 60(b) relief from the judgment.  *See Tyler v. Purkett*, 413 F.3d 696, 701 n. 7 (8th Cir. 2005) (citing *United States v. Lambros*, 404 F.3d 1034, 1036 (8th Cir. 2005) (per curiam)) (noting that the Eighth Circuit has a settled practice of construing Rule 60(b) motions to reopen habeas cases as second or successive petitions when such motions 'effectiely or ultimately' seek habeas relief").

Greene cites *Ybarra v. Filson*, 869 F.3d 1016, 1022-23 (9th Cir. 2017), where the court allowed Ybarra to use a 60(b) motion to revive an existing *Atkins* claim that the district court originally dismissed for technical procedureal reasons, in support of his argument.  In that case, the State did not argue that the *Atkins*

claim asserted in the 60(b) petition was a second or successive petition, nor had Ybarra validly waived his *Atkins* claim and had that waiver affirmed through the appeals process, as Greene has here. *Ybarra*, 869 F.3d at 1022. Moreover, the diagnostic report relied upon by Ybarra had been presented during state-court litigation of his claim but not considered by the state appellate court. *Id.*, 869 F.3d at 1020. Consequently, *Ybarra* is not persuasive authority and does not help Greene establish that his current motion before the Court is not successive.

B. <u>Greene was not diligent and his motion is untimely; consequently, jurisdiction does not lie for its consideration, and extraordinary circumstances are necessarily absent.</u>

Assuming that Greene's attempt to revive his settled *Atkins* claim is not successive, he makes his claim too late. Rule 60(b) imposes strict time constraints on motions for relief from final judgments. A motion is not timely unless it is filed "within a reasonable time" after entry of the judgment or order at issue. Fed. R. Civ. P. 60(c)(1). And a district court lacks jurisdiction to entertain an untimely Rule 60(b) motion. *Nucor Corp. v. Neb. Pub. Power Dist.*, 999 F.2d 372, 373 (8th Cir. 1993).

Greene seeks to overturn this Court's previous determination that he was competent to waive his *Atkins* claim and allow him to litigate his waiver, despite the fact that his unsuccessful petition for certiorari was denied nearly three years ago in May 2017. Greene argues that the factual basis for his motion wasn't

available until Greene submitted to IQ testing, which occurred in 2017, though Dr. Andrews's report is dated approximately two years later.  ECF No. 257, p. 19; ECF No. 257-1, pp. 1-5.  Greene points out that his motion is filed within five months of his submission to a qEEG examination and Dr. Andrews's review of the results to "incorporate them into his analysis[,]" ECF No. 257, p. 19, but Greene offers no reason why the qEEG testing was not done earlier.  Moreover, it is clear from the report that the qEEG results were not necessary to Dr. Andrew's diagnosis.  The diagnosis of "Intellectual Disability, Mild" is stated in part D, "Diagnostic impressons[,]" and based on his 2017 examination, IQ testing, and assessment of adaptive functioning.  ECF No. 257-1, pp. 1-4.  The qEEG results are addressed separately later in the report.  Even later in the document, Dr. Andrews admits that the qEEG results were not necessary to his belated conclusion of intellectual disability when he states that the qEEG results alone do not demonstrate any adaptive deficiencies.  He states under "CONCLUSIONS" that "[t]he recent qEEG revealed significant abnormalities in multiple cortical areas.  *This would be consistent with his intellectual disability*."  (emphasis added)  ECF No. 257-1, p. 5. Because it is irrelevant to Dr. Andrews's diagnosis, the qEEG testing cannot be used to artificially extend the reasonable time for filing Greene's Rule 60(b)(6) motion.  *See also* DSM-5, pp. 33-41 (specifying diagnostic features and diagnostic markers for intellectual disability, which do not include qEEG testing or results).

17

Moreover, Dr. Andrews founded his business, Arkansas Neuropsychology &
Behavioral Health, in 2009, according to its website.  *See* Respondent's Exhibit A
attached hereto, printed February 5, 2020.  Thus, Dr. Andrews (not to mention
other experts like him) was available to evaluate Greene at the time his
competency to waive his *Atkins* claim was litigated before the Court.  Yet no
expert who ever examined Greene from the 1991 murder to the 2017 denial of
certiorari ever diagnosed him with intellectual disability.

Similarly, Greene's resort to *Moore I* and *II* comes far too late to support any
claims of judicial error he contends would not have been apparent until the
decisions were handed down.  First, the *Moore* decisions simply have no bearing on
Greene's case as it stands now because there was no determination made as to his
claim of intellectual disability.  He validly waived that claim.  Second, assuming the
applicability of *Moore*, and further assuming that claims of judicial error premised
on a change in decisional law would, if sufficiently extraordinary for purposes of
Rule 60(b)(6), escape the above-mentioned restrictions for claims of judicial error,
the claims still must be brought within a reasonable time.  Greene did not file his
motion within a reasonable time following the decision in *Moore I*; indeed, *Moore I*
was decided prior to the denial of certiorari in Greene's case.

Also, Greene's motion was filed on December 16, 2019, almost ten months
after the opinion in *Moore II* (February 19, 2019).  Gonzales waited only nine

months after the change in decisional law to bring his Rule 60(b) motion, and that time period was deemed unreasonable. *Gonzalez*, 545 U.S. at 527.

Greene's motion – filed two and a half years after his petition for certiorari was denied, two and a half years after *Moore I* was decided, and after scores of similar motions have been filed and resolved within this jurisdiction and across the country – was not filed within a reasonable time of *Moore I* and *II*. And, while Greene bears the burden of demonstrating circumstances that justify the extraordinary measure of reopening a final judgment, his motion offers no justification or explanation for his inordinate delay in bringing the *Moore I* and *II*-based motion. "Compelling factual reasons or excuses for delay" are integral to a showing of "exceptional circumstances" under Rule 60(b). *See Fox v. Brewer*, 620 F.2d 177, 180-81 (8th Cir. 1980)(referring to Rule 60(b)(1)). Greene offers none other than his expert's mention of a 2019 qEEG test that was not necessary to make his mild-intellectual-disability diagnosis, as discussed below. His motion thus fails to demonstrate extraordinary circumstances and is, without dispute, untimely and must be rejected.

C. Greene does not demonstrate extraordinary circumstances to justify Rule 60(b)(6) relief.

*1. Greene's contention that the DSM-5 constitutes new scientific evidence affecting his Atkins claim waiver is not an extraordinary circumstance.*

Greene contends that the fifth edition of the Diagnostic and Statistical

Manual of Mental Disorders ("DSM-5") published in 2013 changed the diagnostic framework for intellectual disability.  But the changes in the DSM are irrelevant here because Greene never has been found to be intellectually disabled—under any diagnostic framework.  Thus, although Greene seeks to make this case about changes in the law regarding intellectual disability and the criteria for diagnosing intellectual disability in order to make his motion appeal less dilatory, changes in the law simply are irrelevant here.  It would be like Greene arguing, for example, that changes to *Batson* law require a reopening of his case, even there there is no decided *Batson* issue in his case.

Second, Greene had a full opportunity to obtain an intellectual-disability diagnosis and to litigate his current contention that changes in DSM-5 standards mandated a different ruling on the competency to waive his *Atkins* claim after the Court's competency decision in 2012 but prior to its final order issued in 2015. His failure to do so then, and his attempt to do it now that he has secured an intellectual-disability diagnosis for the first time in more than 25 years of litigation, is dilatory and cannot constitute an extraordinary circumstance justifying the grant of Rule 60(b) relief.

In any event, in the area of intellectual disability, the *DSM-5* is "essentially equivalent" to the *DSM-IV-TR* and has simply categorized the *DSM-IV-TR*'s list of skills into three broad domains.  *See Jackson v. Kelley*, 898 F.3d 859, 868 (8th Cir.

2018) (finding "there is no material difference between the *DSM-5* standard and the *DSM-IV* with regard to the connection between subaverage intellectual functioning and adaptive behavior deficits[]"); *United States v. Wilson*, 170 F.Supp.3d 347, 359 (E.D.N.Y. 2016) (same).  And, as the Supreme Court acknowledged in *Moore I*, while an assessment must be informed by the medical community standards, that does not mean it must adhere to everything stated in the latest medical guide.  *Moore I*, 137 S.Ct. at 1049 (citing *Hall v. Florida, 134 S.Ct. 1986, 1995-98 (2014)*).  Thus, Greene's characterization of the DSM-5 as "new scientific evidence" does not rise to the level of an extraordinary circumstance for Rule 60(b) purposes.

2. *Recent decisional law does not undermine the conclusion that Greene has a rational basis for thinking he's not intellectually disabled and does not constitute an extraordinary circumstance.*

Greene contends that the opinions in *Moore I* and *II* constitute an extraordinary circumstance to support his motion because they present new instruction for the application of *Atkins* that he contends undermines the validity of Dr. Pietz's evaluation, upon which the Court based its competency determination. His argument is without merit.

"'Generally, a change in the law that would have governed [a] dispute, had the dispute not already been decided, is not by itself an extraordinary circumstance' warranting Rule 60(b) relief."  *Carlson v. Hyundai Motor Co.*, 222

21

F.3d 1044, 1045 (8th Cir. 2000)(quoting *Kansas Public Employees Retirement Sys. v. Reimer & Koger Assoc.,* 194 F.3d 922, 925 (8th Cir. 1999), *cert. denied*, 529 U.S. 1004 (2000)); *see also Gonzalez*, 545 U.S. at 536-37 (citing established non-retroactivity principles to support conclusion that change in controlling decisional law is "hardly extraordinary" for purposes of reopening a final judgment). Certainly the decisions in *Moore I and II* do not constitute an extraordinary circumstance justifying the relief Greene requests.

First, the Court did not rule on Greene's *Atkins* claim. Thus, as stated earlier, changes in intellectual disability law are irrelevant. Instead, the Court conducted a hearing on his competency to waive that claim and ruled that he was competent to waive it under *Rees*. The *Moore* cases are irrelevant to that competency determination. Although there was some testifmony about intellectual disability at the competency-to-waive hearing, even Greene's attorney recognized in 2011 the differing nature of the two inquiries. In September 2011, before the competency-to-waive-hearing, Greene's attorney noted that a pending hearing on the merits of his *Atkins* claim was cancelled and the competency hearing was set for the limited purpose of addressing the question of his competency. Counsel stated, "Whether Mr. Greene suffers from mental retardation as defined by Arkansas law and [*Atkins*] is irrelevant to whether Mr. Greene is mentally competent to proceed or to waive his rights." ECF No. 175 at p. 2.

22

As the Court pointed out in its order allowing the waiver, ECF No. 196 at 15-16, the *Rees* standard is whether the petitioner "has the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees*, 384 U.S. at 314. Although the two portions of the *Rees* standard appear to be disjunctive alternatives, "there is necessarily an area of overlap between the category of cases in which at the threshold [the Court] sees a possibility that a decision is substantially affected by a mental disorder, disease, or defect, and that of cases in which, after proceeding further, we conclude that the decision is in fact the product of a rational thought process." *Smith By and Through Missouri Public Defender Com'n v. Armontrout*, 812 F.2d 1050, 1057 (8th Cir. 1987). The *Rees* standard does not substitute for a finding of intellectual disability. Moreover, a diagnosis of intellectual disability does not foreclose the possibility of a valid waiver under *Rees*.

This Court's determination that Greene was competent to waive was made after a two-day hearing in which three experts—a neuropsychologist, a neuropsychiatrist, and a psychologist—testified at length about their evaluations of Greene's competency. ECF No. 196, pp. 7-15. Additionally, one of the experts testified about a neurological evaluation by a neurologist. ECF No. 196, p. 9.

23

And while Greene faults the Court for relying on Dr. Pietz's evaluation (which opined that his grooming and communication skills in confinement refutes adaptive deficits) as well as Greene's ability to read, write, speak, and communicate, he neglects to note that Dr. Pietz's evaluation also included testimony about his performance on the WAIS-IV, which resulted in a full scale IQ of 76 and a general ability score of 80, as well as the MMPI-2.  ECF No. 196, pp. 12-13.  The Court also set forth several communications Greene had with the Court and with Pietz in which he expressed his reasoning for wanting to waive his *Atkins* claim.  ECF No. 196, pp. 4-6, 13-15, 17-18.  And, as noted earlier, Greene's appeals were unsuccessful, even after the *Moore I* decision.

Second, Greene overstates the standard set forth in *Moore I* and reaffirmed in *Moore II*.  The fault of the state court in *Moore* was not that it had used an older medical guide that had only recently been updated in determining intellectual disability, but, as described by the Supreme Court, the fault of the Texas appellate court was that it eschewed *any* current medical guide in favor of using its own "invention" which was "untied to any acknowledged source,]" and "[n]ot aligned with the medical community's information" or supported by "Supreme Court precedent[.]"  *Moore I*, 137 S. Ct. at 1044.  The district court did nothing of the sort here in making its competency determination.  And, as noted above, this Circuit has held that the DSM-5 is "essentially equivalent" to the DSM-IV-TR and has found

that, in the area of intellectual disability, "there is no material difference between [the two] with regard to the connection between subaverage intellectual functioning and adaptive behavior deficits." *Jackson*, 898 F.3d at 868. Thus, even had Greene's intellectual disability claim been decided by the Court in 2012, the purported differences between versions of the DSM would not justify a successive habeas petition (even so, Greene had ample opportunity to ask the Court to reevaluate its competency determination in light of the 2013 publication of the DSM-V during the pendency of his habeas action).

Third, Greene told the Supreme Court that the pending *Moore I* case might inform the decision in his case via a footnote in his petition for a writ of certiorari. In footnote 17 at page 32, he noted that *Moore I* was pending and asked the Supreme Court to hold his certiorari petition for the decision in *Moore I*. The Supreme Court issued the *Moore I* opinion on March 28, 2017, well before certiorari was denied in this case on May 1, 2017. Clearly the Supreme Court had the opportunity to reverse and remand Greene's case for further consideration in light of *Moore I*. Instead, it denied certiorari. This fact alone demonstrates that *Moore I and II* do not constitute an extraordinary circumstance warranting Rule 60(b) relief on a claim that was validly waived by the inmate.

Under these circumstances, Greene's assertion that *Moore I* and *II* affect this Court's competency determination simply is wrong and does not constitute an

extraordinary circumstance.  He is simply trying to relitigate his *Atkins* waiver via an untimely Rule 60(b) motion with a belatedly consulted expert witness who is the only one who diagnosed intellectual disability out of the several who have examined him for that condition over a period of nearly 30 years now.  His motion should be denied.

3. *Greene's updated diagnosis of mild intellectual disability is not an extraordinary circumstance.*

Dr. Andrews's diagnosis does not constitute an extraordinary circumstance. Green previously was evaluated three times by a forensic psychiatrist (Dr. Hall), twice by a forensic psychologist (Dr. Simon), three times by psychologists (Dr. Mallory twice, Dr. Pietz once), a neuropsychologist (Dr. Watson), a neuropsychiatrist (Dr. Woods), and a neurologist (Dr. Blake).  None of them ever diagnosed him with intellectual disability.  The weight to be given to Andrews' diagnosis is diminished considerably under these circumstances.[2]

And, as noted above, Dr. Andrews' diagnosis comes two years after it was actually made.  "Compelling factual reasons or excuses for delay" are integral to a showing of "exceptional circumstances" under Rule 60(b).  *See Fox v. Brewer*, 620

---

[2] The accuracy and credibility of the information in his report also would need to be tested further.  For example, at Doc. 257-1, p. 3 he states that Social Security Administration records show Greene's earnings between 1965 and 1992 were approximately $28,000.  Yet, from the date of birth on p. 1 of that document, Greene was only ten years old in 1965, an unusually tender age for a wage-earner.

F.2d 177, 180-81 (8th Cir. 1980)(referring to Rule 60(b)(1)).  Greene offers none

other than his expert's mention of a 2019 qEEG test that was not necessary to

make his mild-intellectual-disability diagnosis.  Under these facts, the diagnosis is

not an extraordinary circumstance.

4.  *The Eighth Amendment prohibition against executing an intellectually disabled person is not an extraordinary circumstance warranting Rule 60(b)(6) relief.*

In a complete 180-degree turn from his attorneys' statement before the

Court's 2012  competency proceedings that a determination of intellectual

disability was irrelevant to a determination of whether he was competent to waive

his *Atkins* claim, ECF No. 175 at p. 2, Greene now argues that the Eighth

Amendment prohibition against executing an intellectually disabled person

requires a determination of whether a person is intellectual disabled before a

determination of competence to waive a claim.  He disingenuously cites *Hall* and

*Moore I* for the proposition that intellectually disabled offenders may not be

executed and that no legitimate penological purpose is served by executing a

person with intellectual disability, neglecting to point out that, in each instance,

the Court was quoting or citing to earlier cases that have never been interpreted to

stand for such a proposition.  *See Hall*, 572 U.S. at 708, citing *Atkins*, 536 U.S. at

317, 320, 321; *Moore I*, 137 S.Ct. at 1051, quoting *Roper v. v. Simmons*, 543 U.S.

551, 563-564 (2005).  Thus, his contention that, "[u]nder *Hall* and *Moore*, a court

may not ask first whether a petitioner with potential intellectual disability is competent to waive his claim" is ludicrous.  *Hall* and *Moore* did not abrogate the standard for competence to waive found in *Rees*.  And, most importantly, the time and place to litigate the question of whether standards originally announced in *Atkins* and *Roper* abrogated *Rees* was in the Court's competency determination completed in 2012, well after *Atkins* and *Roper* were decided.

Furthermore, inmates have been denied stays of execution with unresolved *Atkins* claims which were not considered because they were untimely asserted. *See*, *e.g.*, *Williams v. Kelley*, 858 F.3d 464, 472-475 (8th Cir. 2017) (denying motions for stay and motion to file second or successive habeas petition); *Davis v. Kelley*, 854 F.3d 967, 972-73 (8th Cir. 2017) (per curiam) (same).  Greene's recycled Eighth Amendment quotes from older cases do not constitute an extraordinary circumstance.  His motion should be denied.

## III.  Conclusion

Respondent is mindful that Greene received the penultimate sentence for the murder he committed against Sidney Burnett thirty years ago, which bears some consideration in the equitable endeavor of evaluating extraordinary circumstances. *See Cox v. Horn*, 757 F.3d 113, 126 (3d Cir. 2014).  Greene's sentence, however, does not tip the balance in his favor.  This is particularly and necessarily true considering the various threshold bars to Rule 60 relief discussed herein.  It is also

true considering the lack of demonstration of any extraordinary circumstance, as well as how Greene's timing and utter lack of diligence fits within the larger context and purpose of Rule 60 and habeas corpus.

"AEDPA's acknowledged purpose" is to "'reduc[e] delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007)(quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). Discussing delays occasioned by stay-and-abeyance procedures, the Supreme Court has observed that, "In particular, capital petitioners might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death." *Rhines v. Weber*, 544 U.S. 269,  277-78 (2005). The Court aptly noted that "[w]ithout time limits [on stays], petitioners could frustrate AEDPA's goal of finality by dragging out indefinitely their federal habeas review." *Id.* at 278. The same principle obtains here, in the context of Rule 60. His timing is relevant, and it cuts against his request for relief. "The longer the delay the more intrusive is the effort to upset the finality of the judgment." *Ritter v. Smith*, 811 F.2d 1398, 1402 (11th Cir. 1987). The capital nature of Greene's sentence, moreover, does not logically make it more compelling that a long-final case should be reopened when the asserted grounds for reopening are baseless, as argued herein. "At some point, the State must be allowed to defend its judgment of conviction." *Ryan v. Gonzales*, 568 U.S. 57, 76 (2013).

WHEREFORE, Respondent prays this Court deny Greene's motion for relief from judgment.

Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

BY:  KAREN VIRGINIA WALLACE
Arkansas Bar No.  85043
Assistant Attorney General
**Attorneys for Respondent**
323 Center Street, Suite 200
Little Rock, Arkansas 7220l-2610
Telephone:  (501) 682-8125
Email:  karen.wallace@arkansasag.gov